# United States District Court
# For the District of Rhode Island

| | | |
|---|---|---|
| **DEREK SIVO** | : | |
| | : | |
| **Vs.** | : | **Case No. 1:08-cv-00245-S-DLM** |
| | : | |
| **AT WALL** | : | |
| | : | |

...oOo...

## MEMORANDUM IN SUPPORT OF PETITIONER'S RESPONSE TO GOVERNMENT'S MOTION TO DISMISS PETITION FOR WRIT OF HABEAS CORPUS

Overview

Petitioner filed a *pro se* Motion for Writ of Habeas Corpus by a person in State Custody pursuant to 28 U.S.C. § 2254. Petitioner raised three constitutional issues challenging his conviction by the State of Rhode Island. Specifically, Petitioner raised the issues challenging: 1) Violation of the Due Process Clause of the United States Constitution, U.S. Const. Amend. V, and XIV—denial of motion for judgment of acquittal; 2) Violation of the Due Process Clause of the United States Constitution, U.S. Const. Amend. V, and XIV—erroneous jury instructions; and 3) Violation of the United States Constitution, U.S. Const. Amend. VI, and XIV—United States v. Booker. Pursuant to this Court's Order of June 26, 2008, the Attorney General's Office filed a response moving this Court to dismiss Petitioner's Motion for Writ of Habeas Corpus. Petitioner, by and through counsel, submits his response.

Standard of Review

Since April 24, 1996, the standard of review for reviewing applications for a writ of habeas corpus has been to consider whether the State court decision

resulted in a decision that was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. section 2254(d). If a petitioner asserts that a constitutional error occurred at his criminal trial, the federal court must determine whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." See Fry v. Pliler, 127 S.Ct. 2321, 2328 (2007) (requiring that all assertions of constitutional error at the trial court level be reviewed under the standard in Brecht v. Abrahamson); Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).

**Violation of the Due Process Clause of the United States Constitution, U.S. Const. Amend. V, and XIV— Denial of Motion for Judgment of Acquittal**

The State's experts characterized the cause of J.J. Wooley's injuries as "severe head trauma" – "trauma strong enough to cause alteration of consciousness," like from "a train accident" or falling "out of a window or a tree"; a "life-threatening injury" like "a baseball bat to the head." Tr. pp. 246, 220. It was allegedly an act of "severe acceleration/deceleration," and would result in the individual being unable to maintain lucidity in the hours immediately following the event. Tr. pp. 285, 289. Yet the State could present no evidence identifying this mighty force. In fact, all of the experts agreed that there was no external evidence of the injury on J.J.'s body. Tr. pp. 243, 312, 406-07. When asked by defense counsel to explain why there was no external evidence of such a

powerful force, Dr. John A. Duncan, III, J.J.'s operating surgeon on November 2nd, 2001, answered "God didn't give them any." Tr. p. 246.

Besides the suggestion that God decided not to present any external evidence of child abuse, the State offered no other explanation for how, or even *when* J.J.'s injuries occurred. See Tr. p. 263 (when asked if he knew how the injury originally started, Dr. Duncan responded "Someone does, but not I.") In fact, the State, in its closing argument, told the jury:

> The question you need to decide as a juror is not what kind of mechanism was used to inflict these injuries on this little boy, because the State can't tell you what caused the injuries that happened on November 1st. The Cranston Police cannot tell you that; the Pawtucket Police cannot tell you that; even the pediatricians and the neurologists cannot tell you that. They cannot tell you what caused the horrible injury. So the most important question is what you as jurors have to decide, and that is the question of guilt.

Tr. p. 469. Instead of meeting its burden of proof, the State let the jury speculate as to how and when J.J. incurred this "life-threatening injury," and then decide whether that could be considered child abuse. In fact, the only thing the State asserted it *could* prove was that Derek Sivo was to blame. Left with a substantial amount of expert testimony suggesting that nothing other than a severe blow to the head could cause a subdural hematoma,[1] and the prosecution suggesting that no one but the Petitioner was with J.J. at

---

[1] This prejudicial assertion will be discussed in detail below.

the time the injury most likely occurred,[2] the jury returned with a guilty verdict against Derek Sivo.

The Rhode Island Supreme Court followed course; upholding the guilty verdict by overlooking key facts and ignoring the law. Unfortunately, John Wooley, Jr. did suffer a subdural hematoma and resulting complications at two and one-half years of age. But the mere fact that a toddler developed a saddening brain injury does not mean that in the absence of proof, the State should obtain the conviction of a man who just happened to be near the child *around* the time the injury presented itself. The jury verdict was not based on sufficient evidence. Yet the Rhode Island Supreme Court presented the evidence in such a distorted way that it appeared as if the facts led to only one plausible conclusion: guilty. To borrow a quote from Justice Scalia, the Rhode Island Supreme Court in its State v. Sivo opinion has "look[ed] over the heads of the crowd and pick[ed] out its friends." Roper v. Simmons, 543 U.S. 551, 617 (2005) (Scalia, J., dissenting) (referring to the majority in Roper picking out the legal support and factual basis that supported its conclusion, and ignoring the binding legal precedent and facts that weakened it). The State's expert witnesses projected that the cause of the subdural hematoma occurred anywhere from "within hours of his hospitalization [on the afternoon of November 2, 2001]" to "within 24 to 40 hours" prior. Tr. pp. 253, 312. At most, Derek Sivo was alone with J.J. Wooley for a little over seven hours on November 1, 2001 while Kim Mathieu was at work, and was not with the child at all in the hours

[2] This suggestion was also inaccurate and misleading to the jury. As discussed below, the Petitioner was only taking care of J.J. for a short period of time while his mother was at work. Because none of the doctors could pinpoint when exactly the injury took place, there was nothing to say that the Petitioner was even with J.J. when the alleged trauma occurred.

immediately preceding J.J. Wooley losing consciousness.[3] Tr. p. 354 (Kim Mathieu took her son to Dr. Flynn's, while Derek Sivo stayed behind at home. J.J. did not fall unconscious until after he and his mother left Dr. Flynn's office.) Even the Rhode Island Supreme Court noted that "the *only* contested issues at trial involved exactly *when* and how John Jr.'s injury occurred." State v. Sivo, 925 A.2d 901, 911 (R.I. 2007). Those issues were *the* issues in the case, and were determinative of Derek Sivo's guilt or innocence. Yet the Court was comfortable with the State admitting in its closing argument that it could not prove either of those issues. Tr. p. 469. To rationalize a guilty verdict based on conjecture and finger-pointing, the Supreme Court stated that it was reasonable to find Mr. Sivo guilty because John Jr. was "functioning when Kim left the house" in the morning, and unresponsive and unconscious when Ms. Mathieu returned home and into the following morning. Sivo, 925 A.2d at 912. While the facts as stated by the Supreme Court would fit neatly into their theory, the facts elicited at trial reveal a different version of events.

Kim Mathieu testified that upon returning home at approximately 6:30 that evening, her son was sleeping, but woke up when his mother came in the room, even saying "Hi, Mommy." Tr. pp. 347-48. Ms. Mathieu took J.J.'s temperature and checked on him periodically that night, and J.J. was swallowing the Motrin his mother gave to him. Tr. p. 349. This sequence of events is in sharp contrast with Dr. Asser's testimony that J.J. would not have been able to respond to someone talking to him, or respond if someone moved him around after sustaining his injuries. Tr. p. 288. The Court

---

[3] For a clear timeline of the relevant events that occurred on 11/1/01 and 11/2/01, see Petitioner's Exhibit A attached to this Memorandum.

overlooked those facts[4] when it rationalized the jury's findings and denied Derek Sivo's motion for judgment of acquittal. Sivo, 925 A.2d at 912.

The State concedes that Petitioner has a cognizable claim that the Rhode Island Supreme Court violated Petitioner's appellate due process rights by unreasonably applying clearly established federal law. See Respondent's Memorandum of Law in Support of Motion to Dismiss Petition for Writ of Habeas Corpus pp. 6-7. Petitioner is also asking this Court to recognize that the Rhode Island Supreme Court also unreasonably determined the "facts" of the case in light of the evidence presented at trial. The State is asking this Court to make the same constitutional errors that the Rhode Island Supreme Court made, and find that the evidence at trial was sufficient to convict Mr. Sivo. Petitioner is asking this Court to look at the *actual* evidence used to convict Derek Sivo in this case, as well as the legal standard required for a conviction under Rhode Island General Laws § 11-9-5.3(f), and deny Respondent's Motion to Dismiss the Petition for a Writ of Habeas Corpus.

Despite Kim Mathieu's numerous attempts to determine what had been ailing her son for months, none of the treating doctors were able to give her an answer. Ms. Mathieu asked J.J.'s pediatrician, Dr. Cheryl Flynn, repeatedly if her son's repeated falls and associated symptoms indicated that J.J. was having seizures. Tr. pp. 331-32. Dr. Flynn responded that she was not sure, but that she did not believe they were seizures. Tr. p. 332. Yet when asked by defense counsel at trial, Dr. Flynn admitted that she never conducted any testing on J.J. to determine whether he had been having seizures. Tr. p.

[4] For a more detailed presentation of the difference between the "facts" found by the Rhode Island Supreme Court in its State v. Sivo decision and the facts as they were presented at trial, see Petitioner's Exhibit B attached to this Memorandum.

113. In fact, it appears as if all other plausible explanations for J.J. developing a subdural hematoma on November 2nd, 2001 were ignored by all of the doctors involved. Even Dr. Duncan admitted at trial that although the CT scan done on August 30th, 2001 was initially reported as a normal scan, at the time it was presented to Dr. Duncan, it showed "a small skim subdural hematoma on the left." Tr. p. 230. Therefore, J.J. had at least one prior hematoma before being admitted to Hasbro on November 2nd, 2001. Dr. Duncan explained that hematoma as also resulting from closed blunt trauma to J.J.'s head, and *not* from seizures. Tr. pp. 231-32. In fact, Dr. Duncan was quite *adamant* that *any* kind of subdural hematoma, whether acute or chronic, *has* to come from a **"severe blow to the head."**[5] Tr. p. 232 (emphasis added). Yet once again, by the grace of God, there was no external evidence on J.J.'s body that could explain the source of the hematoma present in August.

The doctors' assertions that a subdural hematoma can only be caused by severe head trauma is not only inaccurate, but also dangerously inflammatory. While Dr. Duncan and Dr. Asser casually dismissed the possibilities of coagulopathy or Marfan syndrome, other known causes of/conditions predisposing one to developing subdural hematomas include the following: external hydrocephalus, glutaric aciduria type 1, a history of a central nervous system infection, large arachnoid cysts, osteogensis imperfecta, severe hemophilia, and even vitamin K deficiency. <u>See</u> Kenneth W. Feldman et al., <u>The Cause of Infant and Toddler Subdural Hemorrhage: A Prospective Study</u>,

---

[5] For a concise summary of what each expert's opinions were with regards to what the 8/30/01 injury was, what the 11/2/01 injury was, whether there was any external evidence of child abuse found on J.J.'s body, what amount of force was required to cause J.J.'s injuries, and the timeframe of when the cause of the 11/2/01 injury occurred, <u>see</u> Petitioner's Exhibit C attached to this Memorandum.

108:3 *Pediatrics* 636-646, 644 (2001); Olaf Bodamer, Subdural Hematomas and Glutaric Aciduria Type 1, 107:2 *Pediatrics* 451 (2001); Joseph H. Piatt, Jr., M.D., A Pitfall in the Diagnosis of Child Abuse: External Hydrocephalus, Subdural Hematoma, and Retinal Hemorrhages, 7:4 *Neurosurgical Focus* 1 (1999) ("External hydrocephalus has been associated with subdural hematomas in infancy, and the hematomas have been noted to be secondary to minor trauma or have even been described as spontaneous."); Thomas Pittman, Significance of a Subdural Hematoma in a Child with External Hydrocephalus, 39 *Pediatric Neurosurgery* 57-59, 57 (2003); Victoria Trenchs et al., Subdural Haematomas and Physical Abuse in the First Two Years of Life, 43 *Pediatric Neurosurgery* 352-357, 352 (2007). Medical researchers have emphasized the importance of ruling out all of these possible explanations before determining the cause of the subdural hematoma, for the very reason that without doing so, medical professionals run the risk of mistakenly accusing caretakers of abusing the children. See National Organization for Rare Disorders, Glutaricaciduria I (2004), *available at http://www.rarediseases.org/search/rdbdetail_abstract.html?disname=Glutaricaciduria%20I* (last viewed on September 8, 2008) ("Babies with glutaricaciduria I are sometimes mistakenly thought by medical professionals to be abused babies because they present with subdural and/or retinal hemorrhages.") In fact, Dr. Thomas Pittman has noted that "there is a perception that in the United States the diagnosis of nonaccidental injury is made too frequently." Thomas Pittman, Significance of a Subdural Hematoma in a Child with External Hydrocephalus, 39 *Pediatric Neurosurgery* 57-59, 57 (2003) ("[I]n the absence of other evidence of inflicted injury, the presence of a subdural hematoma in a child with external hydrocephalus is, by itself, insufficient to prove abuse."); Eva Lai

Wah Fung et al., Unexplained Subdural Hematoma in Young Children: Is It Always Child Abuse?, 44 *Pediatrics International* 37-42, 41 (2002) ("By following this course of action we run the risk of damaging the lives of innocent families, in our attempt to prevent further injury to this or other children.")

Unfortunately, Petitioner was convicted based upon the State's experts incorrectly framing the issue as 'someone abused the child – the question is who did it,' and led the jury to believe a medical condition could not have caused or predisposed J.J. Wooley to the injuries he suffered on November 2nd, 2001. The Rhode Island Supreme Court adopted that approach and framed the facts of the case as supporting that theory. By doing so, the trial and appellate courts have denied Petitioner his Federal Due Process rights, and have allowed a conviction based on insufficient evidence to stand. Petitioner respectfully asks this Court to deny Respondent's Motion to Dismiss, so that this Court may grant the Petition for a Writ of Habeas Corpus and rectify the injustice done in this case.

**Violation of the Due Process Clause of the United States Constitution, U.S. Const. Amend. V, and XIV—Erroneous Jury Instructions**

Petitioner submitted that the trial justice instructed the jury that it had to find that the defendant/petitioner knowingly did an act, but the trial justice did not require the jury to find that defendant/petitioner *knowingly and intentionally* inflicted a serious injury upon the child. Petitioner submits that this failure permitted a conviction predicated on an act without criminal *mens rea.*

The State would have this Court believe that Petitioner has failed to properly exhaust a federal constitutional issue in state court by asserting erroneous jury instructions. See Respondent's Memorandum of Law in Support of Motion to Dismiss

Petition for Writ of Habeas Corpus pp. 3-4. Yet the State Court decision Petitioner relied upon in his appellate brief to the Rhode Island Supreme Court, State v. Lima, relied upon cases that cited United States Constitutional principles in making their determination of a defendant's constitutional rights. See 546 A.2d 770, 772 (R.I. 1988) (citing State v. Adams, 404 N.E.2d 144, 146 (Ohio 1980), which cites Mullaney v. Wilbur, 421 U.S. 684 (1975) for the principle of law; Marcinski v. United States, 479 A.2d 856, 859 (D.C. App. 1984), *cert. denied*, 469 U.S. 1224 (1985) (citing federal constitutional requirements for jury instructions based on either specific or general intent)). While Lima did not explicitly discuss the defendant's federal constitutional rights, the caselaw it relied on derived from federal constitutional principles. Therefore, the reasonable inference is that the jury instruction issue raised is based upon state as well as federal constitutional law, and it is Petitioner's assertion that the State Supreme Court violated Petitioner's Federal Due Process rights when the Court denied Petitioner's appeal. Having asserted that the Rhode Island Supreme Court violated Petitioner's Federal Due Process rights in its State v. Sivo decision, Petitioner has raised a cognizable issue in his Petition for a Writ of Habeas Corpus.

**Violation of the United States Constitution, U.S. Const. Amend. VI, and XIV—United States v. Booker**

Lastly, Respondent suggests that the Rhode Island Supreme Court did not err in finding harmless error in the trial court summarily deciding an element of the crime and depriving the jury of making that determination. Besides citing over two pages of the State v. Sivo decision, Respondent's only argument for dismissing Petitioner's claim regarding the age element is that "it cannot be said that it constitutes a decision contrary to, or involves an unreasonable application of, clearly established Federal law."

Respondent's Memorandum of Law in Support of Motion to Dismiss Petition for Writ of Habeas Corpus p. 14. The Rhode Island Supreme Court properly found error in the trial court taking away an element of the crime from the jury's consideration. Sivo, 925 A.2d at 915. However, it incorrectly found that no prejudice resulted from that error. Id. at 915-16. How could the error be harmless when the age element was the *only* element of the crime needed to change the Petitioner's sentence to a mandatory ten years minimum before Petitioner could seek a suspension/deferment of sentence or probation, and a minimum of eight and one-half years before Petitioner could seek parole? See R.I.G.L. § 11-9-5.3(f). Petitioner asserts that there was harmful error in this case, which denied Petitioner his Federal Constitutional right to have each element of the crime charged proven to a jury beyond a reasonable doubt. Therefore, Petitioner asks that this Court deny Respondent's Motion to Dismiss.

**Conclusion**

For all the foregoing reasons, Petitioner respectfully requests that this Court deny Respondent's Motion to Dismiss Petition for Writ of Habeas Corpus, and schedule this matter for an evidentiary hearing so that Petitioner may prove his asserted claims.

Respectfully Submitted,

Dated: September 9th, 2008

**DEREK SIVO**

By His Attorneys,

/s/ Richard K. Corley ____

Richard K. Corley (#2965)
**Corley Taveras, LLP**
127 Dorrance Street, 2nd Fl
Providence, RI 02903
(401) 861-2100
(401) 861-2139 Fax
rkcorley@ctpllp.com

**CERTIFICATION**

I, the undersigned hereby certify that on this 9th day of September, 2008, I did send a true copy of the Petitioner's Memorandum in Support of Petitioner's Response to Government's Motion to Dismiss Writ of Habeas Corpus by electronic means (ECF) to:

Aaron Weisman
aweisman@riag.ri.gov

/s/_Richard K. Corley____________
Richard K. Corley