UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - -
DEREK SIVO,                        )
          Petitioner,             )
                                   )
     v.                            )     C.A. No. 08-245-S
                                   )
A. T. WALL, Director,             )
Rhode Island Department of        )
Corrections,                       )
          Respondent.             )
- - - - - - - - - - - - - - - -

**MEMORANDUM AND ORDER**

William E. Smith, United States District Judge.

     Derek Sivo, an inmate incarcerated at the Rhode Island Department of Corrections, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction of first degree child abuse of a child under the age of five.  The State of Rhode Island, the designated party-Respondent acting on behalf of A.T. Wall, Commissioner of the Rhode Island Department of Corrections, (collectively, the "State") has moved to dismiss the petition.

     For the reasons set forth below, this Court grants the State's motion to dismiss and denies Sivo's petition.

I.    BACKGROUND AND TRAVEL[1]

    A.    Summary

    On November 1, 2001, Sivo was entrusted with the care of John
W., Jr. ("J.J."), the two and a half year-old child of his
girlfriend Kimberly Mathieu ("Kim").  Kim left for work at 11:15
A.M.  When she returned at 6:30 P.M., Sivo told Kim that J.J. had
fallen down the stairs and was currently resting.  J.J. rested
throughout the night, but the next morning he was unresponsive and
lethargic.

    Kim took J.J. to his pediatrician and then to Hasbro
Children's Hospital (Hasbro), where doctors performed an emergency
craniotomy and removed two clots from his brain.  One was older and
likely originated from a fall that occurred several weeks earlier.
The second clot resulted from an injury that occurred some time
between a few days to mere hours before surgery.  Although the
surgical team was able to save J.J.'s life, the child suffered
significant residual problems from his injuries, including weakness
to his right side, a lack of peripheral vision, speech problems,
and a permanent limp.

    The seriousness of J.J.'s injuries and the hospital staff's
inability to determine their cause prompted the Hasbro Child

_____

    [1] The facts are drawn from the state court decision affirming
Sivo's conviction, State v. Sivo, 925 A.2d 901 (R.I. 2007).
Pursuant to 28 U.S.C. § 2254(e)(1), factual determinations made by
the state courts are presumed to be correct.

Protection Team to contact police.  After an investigation, Sivo was charged in a state criminal information with one count of first-degree child abuse of a child under the age of five, in violation of R.I. Gen. Laws § 11-9-5.3.[2]

B.   Trial

A four-day trial was held in the Rhode Island Family Court, at which Sivo was represented by counsel.[3]  The critical question at trial was when and how J.J.'s injuries were incurred.  The State presented a number of witnesses, including the two physicians who treated J.J., the detective who interviewed Sivo the day after

---

[2] Section 11-9-5.3 provides in pertinent part:

(b) Whenever a person having care of a child, as defined by § 40-11-2(2), whether assumed voluntarily or because of a legal obligation . . . knowingly or intentionally:
    (1)  Inflicts upon a child serious bodily injury, shall be guilty of first degree child abuse.
    (2)  Inflicts upon a child any other serious physical injury, shall be guilty of second degree child abuse.
(c) For the purposes of this section, "serious bodily injury" means physical injury that:
    (1)  Creates a substantial risk of death;
    (2)  Causes protracted loss or impairment of the function of any bodily parts, member or organ, including any fractures of any bones;
    (3)  Causes serious disfigurement; or
    (4)  Evidences subdural hematoma, intercranial hemorrhage and/or retinal hemorrhages as signs of "shaken baby syndrome" and/or "abusive head trauma."

[3] The transcript of Sivo's trial consists of a consecutively-paged transcript of four days of trial proceedings on October 15-18, 2002 ("TT-1"), and separate transcripts of trial proceedings occurring on October 21, 2002 ("TT-2") and October 23, 2002 ("TT-3").

J.J.'s injury, and the victim's mother.  The defense presented one medical witness; Sivo did not testify.  The evidence, as drawn from the record and from the state court decision affirming Sivo's conviction, can be summarized as follows.

Cheryl Flynn, M.D. (Dr. Flynn), J.J.'s pediatrician, testified that she had seen J.J. regularly from the time he was four months old and that his reported medical history did not include seizures. (TT-1 at 91-92.)  Dr. Flynn recalled two instances when J.J. was taken to the emergency room prior to November 2.  The first visit was on August 30, after which Dr. Flynn received J.J.'s hospital report, including the results of a CAT scan, which were negative. (Id. at 92-93.)  On the second ER visit, on October 9, which occurred at Dr. Flynn's direction, J.J. was admitted to the hospital for three days and was diagnosed with viral gastroenteritis.  (Id. at 94-96.)

On November 2, Doctor Flynn testified she received a call from Kim reporting that J.J. was exhibiting the same symptoms that he had on October 9.  (Id. at 96-97.)  At the appointment, Dr. Flynn observed that J.J. was too ill to hold himself up and was virtually non-conversant.  (Id. at 97, 100.)  Dr. Flynn testified that she did not see any signs of abuse on J.J.'s body, although she did not remove his clothing during the examination because he was so weak. (Id. at 107-08.)  She advised Kim to take J.J. directly to the hospital.  (Id. at 99.)

4

Dr. John A. Duncan, chief of neurosurgery at Brown University Medical School and an expert in pediatric neurosurgery, testified that he first saw J.J. on November 2, when he performed surgery to save his life because he had a subdural hematoma on his brain with increased intercranial eye pressure. (TT-1 at 214.) In the course of the surgery, Doctor Duncan observed the presence of both "old blood," indicating a previous serious head injury, and "new blood," indicating a more recent severe head injury. (Id. at 216-17, 250.)

In Dr. Duncan's opinion, a non-accidental major blow to the cranium caused J.J.'s head injury, akin to the type of injury that would occur if he had fallen out a window from a significant height or been hit by a motor vehicle. (Id. at 218.) Dr. Duncan explained that after such a blow J.J. would not have been able to talk and would likely have been sleepy. (Id. at 259-60.) He also testified that J.J.'s injury could not have been caused by a fall down the stairs in Sivo's apartment. (Id. at 223.) According to Dr. Duncan, the only way that the stairwell could have caused J.J.'s injuries would have been if he was forcefully thrown down all the stairs and landed primarily on his head. (Id.)

During the course of J.J.'s treatment, Dr. Duncan reviewed the CT scans of his brain taken on November 2 and on August 29. (Id. at 224-25, 229.) Although the CT scan taken in August originally was classified as "normal," Dr. Duncan testified that his residents later reported a possible small subdural hematoma, but that it was

5

"a very, very tough call." (Id. at 230.) He also said that a subdural hematoma in a child like J.J. could not have been caused by a single seizure because a seizure alone does not produce a hematoma. (Id. at 262.)

On cross-examination, Dr. Duncan testified that although there is usually a visible mark on the scalp of a child who suffers a subdural hematoma, he did not see any such marks on J.J. (Id. at 242-43.) He clarified, however, that he did not see J.J. until he already was prepped for surgery and thus he did not specifically examine his head for injuries before his scalp was opened. (Id. at 240.) Although he could not say where or how J.J.'s injury occurred, he testified as to the approximate time of J.J.'s two brain injuries: one injury occurred at least four to eight weeks before the surgery, leading to chronic fluid in his brain membranes; the more recent injury occurred sometime within the period of a few days to a few hours before surgery. (Id. at 248, 250.) Dr. Duncan also testified that at the time of the recent subdural hematoma, J.J. also suffered an "arterial dissection," or tearing of an artery leading to his brain, which also required considerable force. (Id. at 251-52.) He stated that he was concerned about J.J.'s injuries because no one could explain how they occurred, but he could not conclusively determine whether the injuries constituted child abuse. (Id. at 236, 252.) He did,

however, rule out a seizure as the cause of J.J.'s subdural hematoma. (Id. at 243.)

A second medical witness for the State, Seth Asser, M.D., also treated J.J. on November 2 when he arrived at Hasbro. (TT-1 at 275.) He observed that J.J. was not fully conscious and was virtually nonresponsive. (Id. at 276.) He interviewed Kim, who told him that J.J. had not been his usual self since she returned home from work the previous evening; that J.J. was not well all night and was not responsive when she tried to wake him that morning; and that she then took J.J. to Dr. Flynn's office and eventually to Hasbro. (Id. at 276-77.)

Dr. Asser said that he spoke with Sivo, who told him about J.J.'s fall the previous day. (Id. at 277.) Dr. Asser also learned of J.J.'s two prior ER admissions, and he reviewed and compared the August CAT scan with the November CAT scan of J.J.'s brain, which revealed the subdural hematoma and dead brain cells. (Id. at 278-282, 284.) Dr. Asser testified that J.J.'s brain injury consisted of both an old blood clot that was at least a couple of weeks old and a new blood clot twenty-four to forty hours old. (Id. at 286, 312-13.)

Although he did not observe any outward signs of the cause of J.J.'s brain injury, Dr. Asser classified J.J.'s injury as non-accidental, caused by an acceleration and deceleration of the brain, like that caused by a car accident or a fall from a height

7

of several stories, rather than by a fall down a few stairs or a seizure. (<u>Id.</u> at 285.) Dr. Asser also believed that J.J. would have acted abnormally immediately following his injury; he probably would not have been able to stand or walk, may have been groggy, would not have responded if someone talked to him or moved him, and would have been moaning. (<u>Id.</u> at 288.) Dr. Asser testified that he diagnosed J.J.'s injuries as "child abuse" or "abusive head trauma"[4] and eliminated "shaken baby syndrome" and an undiagnosed seizure condition as potential causes. (<u>Id.</u> at 284, 293, 303.)

Detective Thomas Dodd of the Cranston Police Department testified that on the day of J.J.'s surgery he spoke with Kim and one of J.J.'s doctors at the hospital and later that evening obtained a statement from Sivo. (TT-1 at 114-18.) Det. Dodd testified that Sivo voluntarily reported to the Cranston Police Department for questioning at about 10:40 p.m. and while there, gave a signed statement recounting the chronology of the previous day, November 1. (<u>Id.</u> at 118, 123-27.)

According to Det. Dodd, Sivo said that Kim had considered staying home from work that morning because J.J. was cranky, but eventually went to work, leaving J.J. with Sivo. (<u>Id.</u> at 125.) Sivo played with J.J. and took him out to pick up lunch. (<u>Id.</u> at

---

[4] This Court is uncertain that either of these terms constitutes a formal medical diagnosis and construes Dr. Asser's testimony as opining that J.J.'s injuries <u>resulted from</u> child abuse.

125, 128.)  Sivo told Det. Dodd that upon their return home, Sivo and J.J. were walking down the winding stairway that leads to their basement apartment when, as they neared the bottom of the stairwell, J.J. let go of Sivo's hand.  (Id. at 128.)  As J.J. rounded the corner, Sivo heard him fall down the last few stairs.  (Id. at 129.)  When Sivo saw J.J. on the ground, he was not crying, but he indicated that his "butt" and the back of his head hurt.  (Id. at 129.)  As he rubbed J.J.'s injuries to make them feel better, Sivo noticed a small red mark on the back of J.J.'s head.  (Id. at 133.)  Sivo and J.J. took a nap later that afternoon because J.J. was so ill.  (Id. at 129-30.)  When Kim returned home, Sivo told her about J.J.'s fall.  (Id. at 130.)

Det. Dodd visited Sivo's house in Cranston with a fellow officer and an employee of Department of Children Youth and Families ("DCYF") who took photographs of the staircase down which Sivo said J.J. had fallen.  (Id. at 135, 137.)  He showed the pictures to Dr. Asser, who was a member of the Child Protective Team at Hasbro in November 2001, in an attempt to determine whether J.J.'s injuries could have been caused by his fall on the stairs, or by striking his head against a four-inch cast-iron pipe that protruded into the stairway.  (Id. at 143.)  According to Det. Dodd, Dr. Asser responded to his inquiry with a letter, the

contents of which prompted Det. Dodd to bring charges against Sivo. (<u>Id.</u> at 152-53.)[5]

Kim Mathieu, the victim's mother, testified that J.J. was born on March 8, 1999, and was a very smart and happy baby for the first two years of his life.  (TT-1 at 320, 327.)  Approximately a month after J.J.'s second birthday she began seeing Sivo, and by August 2001 Kim and J.J. were spending nights at Sivo's basement apartment in his parents' home in Cranston.  (<u>Id.</u> at 323-24.)  It was at this time that Sivo started occasionally watching J.J. when Kim went to work.  (<u>Id.</u> at 329, 363-64.)

Kim testified that in late August a friend called her at work -- on a day when Sivo was watching J.J. -- and told her Sivo had taken J.J. to the hospital.  (<u>Id.</u> at 329.)  Sivo later explained to Kim that he was in his room watching television when he heard "a little thump" come from J.J.'s room.  (<u>Id</u>. at 330.)  He told Kim

---

[5] Detective Kevin Shea (Det. Shea) of the Pawtucket Police Department also testified for the State.  He had been contacted because J.J.'s hospital records indicated that he lived in Pawtucket.  (TT-1 at 157-59.)  Det. Shea took recorded statements from Sivo and J.J.'s relatives who were at Hasbro and turned the recordings over to the Cranston Police Department after he determined that the injuries to J.J. probably occurred in Cranston. (<u>Id.</u> at 160, 166.)  The State played the audiotape of Sivo's interview for the jury at trial.  (<u>Id.</u> at 165.)
    Vanessa Ciesla, a child protective investigator for the Department of Children, Youth and Families (DCYF), testified for the State as well.  She interviewed J.J.'s doctor, family members and interviewed Sivo later that day at the Cranston Police Department.  (TT-1 at 177.)  During this interview, Sivo gave an account of his day with J.J. on November 1 that was consistent with his statements to Det. Shea and to Det. Dodd.  (<u>Id.</u> at 177-78.)

that, when he checked on J.J., he found the child on the floor, dazed, with his head to the side. (<u>Id.</u> at 330.)  Sivo said he called 911.  (<u>Id.</u>)  J.J. was released from Hasbro that evening. (<u>Id.</u>)  Kim said that on the day after J.J. came home from the hospital, he fell in the bathroom and hit the back of his head on the tile floor.  (<u>Id.</u> at 333.)  Kim testified that these incidents were not uncommon, as J.J. frequently fell.  (<u>Id.</u> at 346.)

Kim also testified about the events on November 1 and 2.  She stated that she and J.J. had moved in with Sivo in October and were living with him on November 1.  (<u>Id.</u> at 323-24, 326.)  On that day, J.J. woke up at approximately 7:30 or 8 a.m., as was his custom. (<u>Id.</u> at 340.)  She took him to a doughnut shop before she left for work and noticed that he was a little cranky, but generally all right.  (<u>Id.</u> at 340-41, 343.)  Kim went to work around 11:15 a.m. and called Sivo between 3:30 and 4:30 p.m. to check on J.J.  (<u>Id.</u> at 342-43.)  Sivo told her that J.J. was sick, but did not mention J.J.'s fall until Kim returned at about 6:30 p.m.  (<u>Id.</u> at 346.) She found J.J. asleep when she returned, but, upon checking on him, he said, "Hi, Mommy."  (<u>Id.</u> at 348.)  That evening she took his temperature, gave him medicine, and checked on him again during the night.  (<u>Id.</u> at 348-350.)  When J.J. did not wake up the next

morning as usual, Kim called Dr. Flynn and eventually brought J.J. to Hasbro. (<u>Id.</u> at 354, 357.)[6]

The defense called one witness, Dr. Thomas Morgan, M.D., a neurologist on the faculty of Brown University Medical School. Dr. Morgan testified that, in his expert opinion, J.J. was not the victim of abuse. (TT-1 at 400.) Instead, he believed that J.J.'s injuries stemmed from an August 2001 seizure that later caused the child to become weaker on his right side and, thus, clumsier and more prone to falls. (<u>Id.</u> at 384, 387-89.) He believed that the initial August 2001 brain injury predisposed J.J. to the second brain injury in November, and that the two falls together were sufficient to produce an acute and chronic subdural hematoma. (<u>Id.</u> at 387-89, 395.) Dr. Morgan further testified that given this chronic condition, J.J.'s injury on November 1 was "ready to happen," and that any kind of fall could trigger an acute hematoma of the type he ultimately did suffer. (<u>Id.</u> at 389). He further stated that a linear abrasion on the back of J.J.'s neck was consistent with Defendant's description of John Jr.'s fall down the stairs on November 1. (<u>Id.</u> at 413.)

---

[6] The State also presented two other witnesses: John W. Sr., J.J.'s biological father, who testified that J.J. was not a clumsy child and fell no more than the average two-year-old and about how J.J.'s life changed due to his injuries; and Roseann Mathieu, Kim's mother, who testified that J.J. did not want to return to Sivo's home after visits.

Dr. Morgan explained that because J.J. had a chronic subdural hematoma from the August fall, when he suffered the fresh subdural hematoma on November 1, it would have taken time for the blood to enlarge, expand, and create pressure on J.J.'s brain sufficient to make him weak and lethargic. (Id. at 411.) According to Dr. Morgan, this explained why J.J. was able to function normally immediately after the fall, but later was very ill and unable to hold himself up or speak normally. (Id.) On cross-examination, Dr. Morgan admitted that he never actually examined J.J. and that he reached his conclusions by reviewing police reports and medical records and interviewing J.J.'s mother. (Id. at 418-19.)

At the close of all the evidence, defendant made a motion for judgment of acquittal, which was denied. During the jury charge, the trial judge instructed the jury that the fact that John Jr. was a child under eighteen years of age had been proven and that the jury had to accept that the age element of the offense had been established. The jury found Sivo guilty as charged, and Sivo's motion for a new trial was denied on February 10, 2003. On March 24, 2003, the trial court sentenced Sivo to twenty years at the Adult Correctional Institutions ("ACI"), twelve years to serve with the remaining eight years suspended, with eight years probation. (Pet. ¶ 3.)

C.   Appeal

Thereafter, Sivo filed a timely appeal to the Rhode Island Supreme Court (RISC).  On appeal, Sivo argued (1) that in denying Sivo's motion for acquittal based on the insufficiency of the evidence, the state trial judge violated his due process rights under the Fifth and Fourteenth Amendments and under the Rhode Island state constitution; (2) that the trial judge's instruction that the State was not obligated to prove that Sivo specifically intended to inflict physical injury on J.J. was contrary to established Rhode Island law; and (3) that the trial judge violated Sivo's constitutional rights by instructing the jury that the offense element concerning the child's age (five years or younger) had been proven beyond a reasonable doubt, and by imposing an enhanced sentence based on the victim's age.

The RISC rejected Sivo's arguments and affirmed his conviction and sentence.  See State v. Sivo, 925 A.2d 901 (R.I. 2007).[7]  In its opinion, the court reviewed and summarized the testimony of all of the trial witnesses of the State, as set forth above.  Regarding Sivo's first claim, the RISC upheld the trial judge's denial of the motion for judgment of acquittal, finding that the evidence was

---

[7] While Sivo's appeal was pending, the RISC remanded the case to the Family Court for a hearing on various motions, at the conclusion of which the appeal was re-docketed in the RISC.  The RISC also granted Sivo's request for bail pending the outcome of his appeal, and Sivo was released under a surety bond in the amount of $50,000.  These proceedings do not affect the outcome here and are not further discussed.

14

sufficient for a jury to find Sivo guilty of the charged offense. Id. at 909-12.  The court likewise rejected Sivo's argument that the trial judge erroneously instructed the jury regarding intent, ruling that under Rhode Island law, the offense of first-degree child abuse was a general intent offense and that the trial judge explained what was meant by the statutory term "knowingly or intentionally" and did not otherwise err in instructing the jury as to intent.  Id. at 913-15.

The RISC further found that while the trial judge's instruction to the jury that the age element of the offense had been proven was constitutional error, the error was harmless beyond a reasonable doubt.  Id. at 915-916.  Finally, the RISC found that there was no indication in the record that Sivo had been sentenced under the enhanced penalty for abuse of a child aged five years or younger, and that even if he was so sentenced, the error was likewise harmless beyond a reasonable doubt.  Id. at 919.[8]  The RISC's decision is further discussed infra.

D.  Habeas Petition

Sivo thereafter timely filed the instant habeas petition, pursuant to 28 U.S.C. § 2254.  In his petition, Sivo presents three

---

[8] The RISC also rejected Sivo's other arguments that jury selection was improper, that the Family Court lacked jurisdiction over the offense, and that the assignment of the chief judge of the Rhode Island District Court to conduct the trial was improper. Sivo, 925 A.2d at 916-19.  These claims are not at issue and need not be further discussed herein.

claims: (1) that the denial of his motion for acquittal on the basis of insufficiency of evidence violated Due Process and was contrary to U.S. Supreme Court law requiring that the conviction be based upon proof beyond a reasonable doubt; (2) that the trial judge improperly instructed the jury regarding the intent element of the offense; and (3) that the trial judge erred in instructing the jury that the element of the offense concerning the victim's minor age had been proved beyond a reasonable doubt, all in violation of his rights under the Fifth, Sixth and Fourteenth Amendments. (See Attachments to Petition, Pet. at 16-17.)

The State has moved to dismiss the petition, claiming that Sivo failed to exhaust claim (2), as the constitutional aspects of that claim had not been presented to the State courts, and that as to his other two claims, the RISC's decision was not clearly erroneous or contrary to Supreme Court law. Sivo opposed the motion.

Thereafter, this Court appointed Attorney Richard Corley to represent Sivo in this proceeding. Sivo's counsel filed a supplemental memorandum opposing the State's motion to dismiss,[9] as well as a motion to amend the petition to add claims of ineffective assistance and actual innocence. In November 2008, this Court (Martin, M.J.) denied Sivo's motion to amend. See Order dated Nov. 18, 2008 (Doc. #21), reported at Sivo v. Wall, 2008 WL 4960196 (Nov.

---

[9] See Petitioner's Response to Government's [sic] Motion to Dismiss Petition for Writ of Habeas Corpus (Doc. 13 ["Pet'r Mem."].)

16

18, 2008).  In his ruling, Magistrate Judge Martin observed that in proceeding on his original petition, Sivo could either dismiss the unexhausted second claim and proceed on his two exhausted claims <u>or</u> request that the entire petition be held in abeyance while he returned to State court to exhaust the second claim -- but that there were limitations risks associated with the latter course of action.  <u>Id.</u> at *2.

In January 2010, Sivo filed a Motion to Withdraw the unexhausted claim and to proceed on his remaining two exhausted claims (Doc. #25).  That motion will be granted, and Sivo's second claim shall be deemed withdrawn.  Accordingly, this Memorandum and Order will focus on his two remaining claims, which are now ready for decision.[10]

## II. DISCUSSION

### A.   Principles

This Court's consideration of Sivo's claims is governed by § 2254, which states in pertinent part:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[10] Because the facts concerning the state court proceedings are not disputed, the Court determines that no hearing or argument is necessary in this matter.

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(d)-(e), as amended by the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA").

The terms "contrary to" and "unreasonable application" in § 2254 have independent meanings. See Bell v. Cone, 535 U.S. 685, 694 (2002). The "contrary to" clause applies only when a state court either employs a test or rule of law that is inconsistent with one announced by the U.S. Supreme Court, or reaches the opposite conclusion on materially indistinguishable facts. See id.; Williams v. Taylor, 529 U.S. 362, 404-10 (2000); Rashad v. Walsh, 300 F.3d 27, 34-35 (1st Cir. 2002). An "unreasonable application" of federal law exists when a state court (1) uses the correct legal standard in an objectively unreasonable manner, (2) unreasonably extends Supreme Court precedent to an inappropriate context, or (3) fails to extend such Supreme Court precedent to an appropriate context. See Bell, 535 U.S. at 694; Rashad, 300 F.3d at 34-35. This standard "does not demand infallibility: a state court's decision may be objectively reasonable even if the federal habeas court, exercising its independent judgment, would have reached a different conclusion." Rashad, 300 F.3d at 35.

18

Although what constitutes an "unreasonable determination of the facts" may be difficult to define, "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." <u>Wood v. Allen</u>, 130 S. Ct. 841, 849 (January 20, 2010) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000)).   Moreover, "[a] state court's findings on factual issues 'shall be presumed to be correct' and the petitioner bears the burden of disproving factual findings by 'clear and convincing evidence.'" <u>McCambridge v Hall</u>, 303 F.3d 24, 34-35 (1st Cir. 2002) (quoting 28 U.S.C. § 2254(e)(1)).

B.   Motion for Acquittal

Sivo first alleges that the trial judge's denial of his motion for acquittal on the basis of insufficiency of evidence -- and the RISC's upholding of that denial -- violated Due Process and was contrary to U.S. Supreme Court law requiring that the conviction be based upon proof beyond a reasonable doubt.   (Pet., Ground One.) He contends that because there was no direct evidence of either how or when J.J.'s injuries occurred or who did it, the State failed to prove his guilt beyond a reasonable doubt and his motion for judgment of acquittal should have been granted.   (Pet'r Mem. at 2-6.)[11]

---

[11]   Sivo also argues that there are other known causes or conditions predisposing one to developing subdural hematomas and cites several medical treatises in support of this argument.   (<u>See</u>

19

The pertinent standard of review for a habeas claim challenging the sufficiency of the evidence was set forth in <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).   Under <u>Jackson</u>, a federal habeas court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."   <u>Id.</u> at 319 (emphasis in original).   <u>See</u> <u>O'Laughlin v. O'Brien</u>, 568 F.3d 287, 299 (1st Cir. 2009), <u>rehr'g en banc denied</u>, 577 F.3d 1 (1st. Cir. 2009) (same).

While a defendant is entitled to have the State prove every element of the offense beyond a reasonable doubt, <u>see</u> <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), a habeas court must accord deferential review to a state court's finding and assessment of the sufficiency of the evidence to convict a defendant of an offense. <u>Jackson</u>, 443 U.S. at 319.   As the U.S. Supreme Court recently observed:

> A federal habeas court can only set aside a state-court decision as "an unreasonable application of ... clearly established Federal law," § 2254(d)(1), if the state court's application of that law is "objectively unreasonable," <u>Williams v. Taylor</u>, 529 U.S. 362, 409 (2000).   And <u>Jackson</u> requires a reviewing court to review the evidence "in the light most favorable to the prosecution." 443 U.S., at 319.   Expressed more fully, this means a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear

_____

Pet'r Mem. at 7-9.)   However, this argument was not presented either at trial on Sivo's direct appeal, nor does it raise any constitutional issue.   Thus, the claim will not be addressed here.

> in the record--that the trier of fact resolved any such
> conflicts in favor of the prosecution, and must defer
> to that resolution."  Id., at 326.

McDaniel v. Brown, 130 S. Ct. 665, 673 (Jan. 11, 2010).

The term "objectively unreasonable" requires "some increment of incorrectness beyond error."  O'Laughlin, 568 F.3d at 299 (quoting McCambridge, 303 F.3d at 36 (further citations omitted). "The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court."  Id.

Here, in its decision affirming Sivo's conviction the RISC noted that the critical question at trial was when and how J.J. was injured.  The RISC carefully summarized the evidence presented by both sides.  Sivo, 925 A.2d at 911-16.  The court observed that the treating physicians gave unequivocal testimony that J.J.'s injury, including his most recent subdural hematoma injury, was caused by a non-accidental trauma.  Id. at 911-12.  There was also unopposed, if circumstantial, evidence that Sivo was the only person with J.J. for more than six hours the previous day.  The RISC noted that both Dr. Duncan and Dr. Asser testified that J.J.'s injuries could not have been caused by a fall near the bottom of the stairs leading to Sivo's basement apartment, id. at 907, 908 -- as Sivo maintained -- thereby giving rise to an inference that there was some other sudden "nonaccidental trauma" that precipitated J.J.'s injuries.

Moreover, both Dr. Duncan and Dr. Asser testified that J.J. suffered other injuries in addition to the subdural hematoma –– namely, retinal hemorrhaging and a dissected artery and that such injuries were the result of substantial nonaccidental trauma. (TT-I at 251-53, 290-91, 299-300.)  From this, Dr. Duncan concluded that J.J. had suffered "a significant serious injury" on the day of, or just prior to, his surgery (id. at 252).

Sivo points to several facts not mentioned by the RISC, including the fact that the victim's mother interacted with J.J. on two separate occasions between the time she arrived home on November 1 and the time J.J. was awoken the next morning, and that she was home during part of the 24-48-hours period preceding J.J.'s surgery during which his doctors believed the injury was incurred.  (See Pet'r Mem., Ex. B.)  However, this evidence did not require the jury to find that J.J.'s injury could not have been incurred prior to Kim's arrival home on November 1.  The fact that the jury chose to believe the testimony of the State's medical witnesses over that of Sivo's medical witness does not mean that Sivo's constitutional rights were violated.  Moreover, the RISC noted evidence that J.J.'s medical condition was significantly worse when Kim returned home at 6:30 PM than when she had left that morning.  Sivo, 925 A.2d at 912.

In essence, Sivo's claim is that there was evidence at trial cutting against a finding of guilt in addition to evidence supporting a finding of guilt.  This Court acknowledges that Sivo's

motion for acquittal presented a close question -- particularly given the lack of any direct evidence concerning how and when the the victim's injuries occurred, or whether they were intentionally inflicted, and Sivo's consistent explanations to law enforcement officials on the date of injury regarding J.J.'s accident.  However, under AEDPA this Court may not retry the state court case or second-guess the jury's verdict, the trial judge's determination on the motion for judgment of acquital, or the RISC's upholding of that verdict.  Even if this Court were to disagree with the result, this does not mean that the RISC's decision was clearly erroneous or an unreasonable application of law, or that it constituted "an unreasonable determination of the facts in light of the evidence." § 2254(d)(2).  See Rashad, 300 F.3d at 34-35 ("a state court's decision may be objectively reasonable even if the federal habeas court, exercising its independent judgment, would have reached a different conclusion"); McCambridge, 303 F.3d at 36 (if case is a close case, then state court finding cannot be unreasonable).  In short, Sivo has not rebutted the presumption of correctness that attends the state court's factual findings in his case.  § 2254(e)(1).[11]  The bottom line is this: it may well be that other

---

[11] This case is similar to but distinguishable from the recent First Circuit decision in O'Laughlin v. O'Brien, supra.  In O'Laughlin, a panel of the First Circuit granted habeas relief to a petitioner who had been convicted of armed assault with intent to murder and related offenses.  The evidence convicting O'Laughlin was circumstantial, based on his status and his behavior before and after the assault.  He was on the maintenance staff in a

trial judges sitting on this case may have granted the Motion for Judgment of Acquittal, while others would leave the question to the jury; it may be that another jury would find reasonable doubt in the disputed evidence.  But this trial judge and this jury did not and it is not for this Court, in hindsight, to retry the case.  It cannot be said with certainty that the jury's verdict and the courts' holdings where clearly erroneous and/or unreasonable.

---

condominium complex, lived in the complex a few doors down from the victim, and had a master key to her unit.  In the hours before the assault, McLaughlin had run out of drugs and money and was looking to purchase more drugs.  Within minutes after the assault (approx. 2:00 a.m.) he was found by police wandering in the condominium parking lot in his underwear.  He told police that he had gone outside because he had heard animal noises and initially refused a police request to search his apartment.  The Massachusetts Appeals Court reversed the conviction, concluding that the evidence insufficiently linked McLaughlin to the crime to prove beyond a reasonable doubt that he was the perpetrator.  O'Laughlin, 568 F.3d at 295.  The Massachusetts Supreme Judicial Court (SJC) reversed and reinstated the conviction, finding the same circumstantial evidence to be sufficient for conviction.  Id. at 295-298.  O'Laughlin then filed a petition for writ of habeas corpus in federal district court, which denied relief.

The Court of Appeals reversed and granted habeas relief vacating the conviction.  The court noted that although circumstantial evidence alone can support a conviction, here it amounted to only a reasonable speculation and not evidence beyond a reasonable doubt.  Id. at 302.  After reviewing all of the circumstantial evidence, the court held that based on the record before it and drawing all reasonable inferences in favor of the prosecution, "it would be overly speculative to conclude [petitioner] to be the assailant beyond a reasonable doubt." Id. at 308.  However, in O'Laughlin, unlike the instant case, there was no evidence that the defendant was with the victim at the time the offense occurred.

C.    Instruction Regarding Age

Sivo's second and final claim is that the state trial judge erred in instructing the jury that the element of the offense concerning the victim's age had been proved beyond a reasonable doubt, in violation of his rights under the Fifth, Sixth and Fourteenth Amendments.  He further claims that the RISC correctly found that this instruction was constitutionally erroneous but incorrectly found that the error was harmless.  (Pet'r Mem. at 11.)

At trial, the judge instructed the jury that the prosecution had proven that J.J. was a minor and that the jury must accept that fact.[12]  When defense counsel objected, the trial judge responded

---

[12] The instruction in question was as follows:

THE COURT:  We consider the charge of child abuse in the first degree; that is, that this Defendant in this case did abuse [J.J.], a child under the age of five, by inflicting upon said child very serious bodily injury.
     There are four elements that the state must prove beyond a reasonable doubt: number one, that the victim was a child, and by law a child under the age of 18 years of age.  And I charge you as a matter of law that that issue and that element has been proven, and there is no dispute on that element.
          * * * *
     Now, the first element I have indicated to you, you must accept as proven, proven already.

(TT-1 at 492-93 (emphasis added).)

Because the instruction effectively removed from the jury's province the age element of the offense, it is unnecessary to explore whether the jury was confused by the discrepancy in age in the course of the instruction.

25

that the fact of the child's age had been proven beyond a reasonable doubt.[13]

In its decision the RISC noted a criminal defendant's constitutional "right to demand that a jury find him guilty of all the elements of the crime with which he is charged," Sivo, 925 A.2d at 915 (quoting United States v. Booker, 543 U.S. 220, 230 (2005)) (further citation omitted), and that "a jury instruction that relieves the state of its burden of proving each element of a crime charged beyond a reasonable doubt violates a defendant's due process rights." Id. The RISC further noted, however, that a trial judge's error in removing an element of the crime from the jury's consideration does not automatically warrant reversal and that it would affirm a conviction if it concludes that the error was

---

[13] The colloquy on this point was as follows:

MR. CICILLINE:  As to the age . . ., age still has to be proved.

THE COURT:  The date of birth was issued.  There is no question in this Court's mind that the age of the child has been determined and fits the statutory scheme.  They don't have to go through that element.  It has been proven beyond a reasonable doubt.

MR. CICILLINE:  There is still an element that has to be proven.  They have to accept it [the testimony concerning J.J.'s age] to be proof beyond reasonable doubt, so I object to that.

THE COURT:  Your objection is noted.

(TT-1 at 499.)

26

harmless beyond a reasonable doubt.  <u>Id.</u> (citing <u>State v. Hazard</u>, 745 A.2d 748, 752 (2000)).[14]

Using this approach, the RISC found that although it was error for the trial judge to instruct the jury that the child's age was proven beyond a reasonable doubt, that error was harmless.  <u>Id.</u>  The court explained (1) that in his closing argument defense counsel repeatedly referred to the victim as a child; (2) that both of the victim's parents testified as to J.J.'s date of birth without objection or cross-examination by defendant; (3) that it was uncontroverted that the victim was treated by a pediatrician at a children's hospital; and (4) that Sivo did not raise the issue any time prior to the jury instructions.  <u>Id.</u>  The RISC concluded that in light of these factors it was "inconceivable that a jury could have found [the age issue] unproven even absent the trial judge's erroneous instruction."  <u>Id.</u>

This Court finds that the RISC correctly discussed and referenced U.S. Supreme Court case law in its decision, and that its

---

[14] Specifically, the RISC noted its statement in <u>Hazard</u> that:

Under this approach, "an instructional omission, misdescription, or conclusive presumption can be subject to harmless-error analysis [only in three 'rare situations']: (1) where the defendant is acquitted of the offense on which the jury was improperly instructed * * *; (2) where the defendant admitted the element on which the jury was improperly instructed; and (3) where other facts necessarily found by the jury are the 'functional equivalent' of the omitted, misdescribed, or presumed element." [745 A.2d] at 753 (quoting <u>Neder v. United States</u>, 527 U.S. 1, 13 (1999)).

<u>Sivo</u>, 925 A.2d at 915.

conclusion was not objectively unreasonable. See McCambridge, 303
F.3d at 36.   Indeed, the result was consistent with federal court
case law on similar issues.   See United States v. McLaughlin, 386
F.3d 547, 553-55 (3d Cir. 2004) (holding that harmless error review
applied when the trial court instructed the jury that materiality
element of counts for perjury and failure to disclose a material
fact had been satisfied as a matter of law).

Sivo further contends, however, that this error cannot be
harmless because due to the directed finding as to the victim's age,
Sivo qualified for an enhanced penalty under the state offense
statute.   Compare R.I. Gen. Laws § 11-9-5.3(e) with (f).[15]   (Pet'r
Mem. at 11.)   In effect, he argues that the fact that a jury did not
make this finding violated United States v. Booker, supra, and

---

[15] Those provisions state:

(e) Any person who commits first degree child abuse shall
be imprisoned for not more than twenty (20) years, nor
less than ten (10) years and fined not more than ten
thousand dollars ($10,000).   Any person who is convicted
of second degree child abuse shall be imprisoned for not
more than ten (10) years, nor less than five (5) years
and fined not more than five thousand dollars ($5,000).
(f) Any person who commits first degree child abuse on a
child age five (5) or under shall not on the first ten
(10) years of his or her sentence be afforded the benefit
of suspension or deferment of sentence nor of probation
for penalties provided in this section; and provided
further, that the court shall order the defendant to
serve a minimum of eight and one-half (8 1/2) years or
more of the sentence before he or she becomes eligible
for parole.

R.I. Gen. Laws, § 11-9-5.3(e)-(f).

cannot be deemed harmless error.   This contention is likewise
without merit.

In its decision the RISC noted that there was no indication in
the record that the trial judge relied on § 11-9-5.3(f) in
sentencing Sivo, as the trial judge made no reference to that
provision or to the penalties set forth therein.   <u>Sivo</u>, 925 A2d at
919.   The court also found that even if the trial judge relied upon
§ 11-9-5.3(f), his error was harmless beyond a reasonable doubt.
<u>Id.</u>

Again, this Court cannot say that the RISC's conclusion on this
point was erroneous or unreasonable.   Federal case law establishes
that an error in jury instructions is not structural, and <u>Booker</u>
errors *are* subject to harmless error analysis.   See <u>Washington v.</u>
<u>Recuenco</u>, 548 U.S. 212, 222 (2006) ("Failure to submit a sentencing
factor to the jury, like failure to submit an element to the jury,
is not structural error.") (finding error harmless); <u>United States</u>
<u>v. Vasquez-Rivera</u>, 407 F.3d 476, 489 (1st Cir. 2005) ("[E]ven when
it involves an underlying Sixth Amendment violation, <u>Booker</u> error
is not structural in nature . . . . Thus, preserved <u>Booker</u> error .
. . must be reviewed for harmlessness.") (citations omitted); <u>United</u>
<u>States v. Kuehne</u>, 547 F.3d 667, 679-82 (6th Cir. 2008) (failure to
have jury determine that defendant committed prior crimes was
harmless error in view of uncontradicted evidence that he committed
them) and <u>id.</u> at 681 n.4 (noting the continued vitality of <u>Neder</u>

29

post-<u>Booker</u>); <u>United States v. Oliver</u>, 379 F. Supp. 2d 754, 764-5 (E.D. Pa. 2005) (failure to have the jury find that "personal property" was stolen deemed harmless error because evidence that items were personal property was uncontested).

Based on the foregoing, this Court finds that the RISC's decision on this issue was not contrary to or an unreasonable application of federal law, nor was it based on any unreasonable determination of facts. Sivo does not dispute that J.J. was age five years or younger at the time of the offense in question. As such, the RISC's conclusion that the jury instruction that the victim's age had been proven constituted harmless error was not objectively unreasonable and does not warrant habeas relief. Therefore, this claim fails.

III. CONCLUSION

For the reasons Stated above, this Court hereby ORDERS as follows:

(1) Sivo's motion to withdraw his unexhausted claim (Doc. 20) is hereby GRANTED;

(2) the State's Motion to Dismiss Petition for Writ of Habeas Corpus (Doc. 3) is GRANTED, and Sivo's petition is DENIED and DISMISSED.

<u>GRANT OF CERTIFICATE OF APPEALABILITY</u>

Pursuant to Rule 11(a) of the Rules Governing § 2254 Proceedings in the United States District Courts ("2254 Rules"),

this Court hereby finds that in view of the close question presented concerning whether the denial of Sivo's motion for judgment of acquittal violated his constitutional rights, this case is appropriate for the issuance of a certificate of appealability (COA). <u>See</u> 28 U.S.C. § 2253(c)(2). Accordingly, a COA shall issue forthwith.

IT IS SO ORDERED:


*/s/ William E. Smith*
William E. Smith
United States District Judge
Date: June 28, 2010

31